**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MATTHEW GOODMAN, individually and
on behalf of all others similarly situated,

                    Plaintiff,

    v.

CHURCH & DWIGHT CO., INC.,

                    Defendant.

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff Matthew Goodman ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Church & Dwight Co., Inc. ("Defendant" or "C&D"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself which is based on personal knowledge.

**NATURE OF THE ACTION**

      1.     Plaintiff brings this class action on behalf of himself and similarly situated consumers who purchased Trojan condom products (the "Condoms" or the "Products").

      2.     C&D is a major American manufacturer of household products, including the Trojan brand condoms. Trojan offers more than 30 varieties of condoms.

      3.     Condoms are most commonly manufactured with latex, either synthetic or natural. Synthetic latex is produced from petrochemicals and can be created anywhere. Natural latex, though, is derived naturally from rubber trees—most commonly the Pará rubber tree (Hevea brasiliensis).

4.      Defendant manufactures and distributes latex and non-latex male condoms in the United States, primarily under its Trojan brand.

5.      The Products' packaging claims the brand is "trusted for over 100 years" and is "triple tested."

6.      However, unbeknownst to consumers, the Products are unfit for their intended purpose because they contain PFAS, "forever chemicals," which are dangerous to human health. This not disclosed anywhere on the Product packaging.

7.      PFAS are a group of synthetic chemicals. Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers.

8.      Furthermore, the Centers for Disease Control and Prevention ("CDC") outlined a host of health effects associated with PFAS exposure, including liver damage, decreased fertility, and increased risk of asthma.

9.      Accordingly, Plaintiff bring claims against Defendant individually and on behalf of a class of all others similarly situated for claims of breach of warranties, fraud, state consumer protection laws, and unjust enrichment.

## PARTIES

10.      Plaintiff Matthew Goodman is, and at all times relevant to this action has been, a resident of New York, New York. In or around October 2023, Mr. Goodman purchased Defendant's Trojan Ultra Thin condoms from a local pharmacy store located in New York, New York. When Mr. Goodman made his purchase, he carefully reviewed the Product's labeling. He did not see anywhere on the packaging a disclosure or statement that the Products contained

PFAS, or the harm that may result from contact with PFAS. Based on the label, he reasonably

believed the Product was safe for use on his genitalia. But the Product contained PFAs. Had

Defendant disclosed on the label that the Products contained PFAS chemicals, and the harms that

can result from contact with PFAS chemicals, he would not have purchased the Products, or at

the very least, would have only been willing to pay significantly less. As a direct result of

Defendant's material misrepresentations and omissions, Mr. Goodman suffered, and continues to

suffer, economic injuries. Mr. Goodman would consider purchasing Defendant's Products in the

future if Defendant removed the PFAS chemicals from them.

11.     Defendant Church & Dwight Co., Inc. is a Delaware corporation with its principal

place of business in Ewing, New Jersey.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A).

There are more than 100 Class Members, the aggregate claims of all members of the proposed

Class exceed $5,000,000.00, exclusive of interest and costs, and at least one Class Member is a

citizen of a state different than Defendant.

13.     This Court has personal jurisdiction over Defendant because Defendant conducts

substantial business in the State of New York such that Defendant has significant, continuous,

and pervasive contacts with this state, and because a substantial portion of the events giving rise

to this complaint occurred in this District.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because this District

is where a substantial part of the conduct giving rise to Plaintiff's claims occurred and where

Defendant does substantial business.

## FACTUAL ALLEGATIONS

### I.    The Products and Defendant's Marketing

15.    Defendant manufactures, markets, and sells Trojan brand condoms worldwide in a variety of shapes and styles.

16.    Most of Defendant's Trojan condom Products, including the Product purchased by Plaintiff, are lubricated latex condoms that serve as contraceptives and sexual transmitted disease protection during sexual intercourse. Defendant's Products instruct users on how to place them on male genitalia.



17.    Defendant's Products tout they are "America's #1 Condom." The Products further state that they have been "trusted for over 100 years" and are made from "premium quality latex."



18.     Defendant has thus cultivated a brand image of quality and trustworthiness.

19.     However, Defendant's packaging does not disclose the presence of PFAS chemicals.

20.     Reasonable consumers purchased and continue to purchase Defendant's Products under the reasonable belief that they do not contain synthetic chemicals that could adversely impact their health or the health of their sexual partners.

**II.     PFAS in Defendant's Products.**

21.     Defendant's Products pose a health and safety risk due to the presence of PFAS in the Products.

22.     The Products Plaintiff purchased were sent to an independent lab for testing, the results of which found the presence of organic fluorine in Plaintiff's Products, confirming the presence of PFAS.

23.     Organic fluorine is a marker for PFAS because all PFAS are carbon-based compounds that contain fluorine.

24.     Total organic fluorine analysis is used to detect organic fluorine, which is the foundational element (and defining characteristic) of PFAS chemicals.

25.      In the context of chemistry, the term "organic" refers to compounds containing carbon. Organic fluorine is created by the chemical bond between carbon atoms and fluorine atoms. The strong bond created between carbon and fluorine is what defines PFAS chemicals and is the reason for their common usage.

26.     Total organic fluorine testing is critical to the detection of the 99.99% of PFAS that cannot be detected through limited targeted testing. Because organic fluorine is the identifying element of PFAS chemicals and is present in all PFAS varieties, the detection of organic fluorine in a sample necessarily means that PFAS chemicals are present in some form.

27.     It is nearly impossible for total organic fluorine testing to yield a false positive detection of PFAS in a sample. Total organic fluorine testing only measure fluorine that originates from a substance where fluorine is attached to a carbon backbone. Therefore, total organic fluorine testing does not detect any other forms of fluorine, such as inorganic fluorine (i.e., fluoride).

28.     Organic fluorine is not naturally present in the human body, and is practically nonexistent outside of its use in man-made PFAS chemicals.

29.      In light of the limitations of targeted testing, total organic fluorine testing is the only method that is able to reliably detect the presence or absence of the thousands of varieties of PFAS chemicals for which targeted testing is not currently available.

30.     Consequently, total organic fluorine testing is widely accepted by scientists, researchers, and regulators as the reliable method to detect a PFAS chemical in a sample.

31.      According to Scott Belcher, Ph.D. & Associate Professor with the Center for Environmental & Health Effects of PFAS at North Carolina State University, "fluoropolymers, such as polytetrafluoroethylene (PTFE), are extremely common forms of PFAS that could be contributing to the organic fluorine found in [products]. Methods used for detecting individual PFAS, such as PFOA or GenX, cannot directly identify PTFE. However, the analysis of total organic fluorine (TOF) does account for all PFAS contaminants in [products], including PTFE. Therefore, this method of testing serves as a good 'spot-check' of consumer products."

32.     The presence of PFAS in Defendant's condoms raise legitimate concerns regarding their impact on consumer health. PFAS can enter the body during sexual intercourse through skin absorption. The female and male genitals have delicate tissues that are more prone to absorbing chemicals than other areas of the body. When condoms are placed on genitalia, PFAS can be absorbed readily.

33.     What is more, when body temperature increases during sexual intercourse, the heat can increase the transfer of PFAS through the skin barrier. PFAS may also enter consumers' bodies orally during or after the use of Defendant's Products during sexual activity.

**III.     PFAS Chemicals Are Harmful to Humans**

34.     According to the Agency for Toxic Substances and Disease Registry, PFAS chemicals "are man-made chemicals that have been used in industry and consumer products worldwide since the 1940s.  They have been used to make nonstick cookware, water-repellent clothing, stain resistant fabrics and carpets, some cosmetics, some firefighting foams, and products that resist grease, water, and oil."

35.    One common characteristic of concern in regard to PFAS is that many types break down very slowly and can build up in people, animals, and the environment over time. In fact, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—making them highly persistent in the environment and our bodies.

36.    Consequently, PFAS chemicals are often referred to as "forever chemicals."

37.    PFAS are often divided into two groups: long chain and short chain, both of which break down slowly, if at all. In fact, long chain PFAS have been banned in the European Union and phased out by major U.S. manufacturers due to their health risks.  Regardless of length, research from the U.S. National Toxicology Program suggests that both long chain and short chain PFAS have similar levels of toxicity.

38.    PFAS chemicals have been connected with severe and lingering health consequences.  Erika Schreder, Director of Science at Toxic-Free Future, and Jennifer Dickman, Senior Program Associate of Safer Chemicals, Healthy Families, have explained that "[p]rimary among [PFAS-linked health concerns] are cancer and effects on lipid metabolism, but they also include immune suppression, thyroid disease, and harm to reproduction."

39.    Similarly, Dr. Lina S. Birnbaum, stated that "[t]hese toxic chemicals are linked to serious problems like cancer, liver damage, decreased fertility, and asthma. … PFAS can [also] weaken our immune system, making us more vulnerable to infectious diseases like COVID-19."

40.    In children, PFAS has also been linked to "[l]ower antibody response[s] to some vaccines," thereby rendering children more vulnerable to disease they would otherwise be immune from.

41.    Significantly, a study conducted by the National Institute for Occupational Safety and Health found that "dermal exposure to PFOA is immunotoxic and raise concern about potential adverse effects from dermal exposure."

42.    PFAS chemicals can be harmful at extremely low levels of exposure. According to the EPA, the levels at which negative human health effects could occur are significantly lower than previously understood, including at near zero in some instances.

43.    In other words, there is no "safe" level of exposure to PFAS chemicals. Even "trace" levels of PFAS can be harmful to human health.

44.    There is no effective treatment for removal of PFAS chemicals from the body. Therefore, experts agree that the most effective strategy to decrease health risk is to avoid and/or limit exposure to products known to contain PFAS chemicals.

45.    Only in recent years has the presence of PFAS used in consumer products, and their consequent risks, begun to be publicized and discussed in the media and scientific literature. Based on this newly available information, consumers are rightfully concerned about the presence or risk of PFAS in various consumer products.

46.    In June 2022, the EPA announced a lifetime health advisory related to PFAS. A health advisory is not a binding regulation but serves as "informal technical guidance to assist government officials." The June 2022 advisory sets lifetime health advisory levels for PFOA at 0.004 parts per trillion (ppt) and PFOS at 0.02 ppt. These levels are below the detection capability of most measurement devices, meaning that EPA considers any detection of PFOA or PFOS to exceed the lifetime health advisory level.

47.    On April 10, 2024, the Biden Administration issued the first-ever national, legally enforceable drinking water standard to protect communities from exposure to PFAS. The

standards set a maximum contaminant level of 4 parts per trillion for PFOA and PFOS individually. For other forms of PFAS, the maximum set by the Administration is 10 parts per trillion.

48.     Moreover, for PFOA and PFOS, EPA is setting a Maximum Contaminant Level health-based goal at zero. This is reflective of the latest science supporting that there is no level of exposure to PFAS without risk of health impacts, including several cancers.

49.     In light of the harm caused by PFAS, consumers have grown increasingly aware of and concerned about PFAS in their bodies, the environment, and the products they use. In a survey of more than 1,000 consumers, nearly all participants (98%) indicated they were interested in knowing about the presence of harmful chemicals in everyday products.

50.     Relevant here, repeated exposure to PFAS have been linked to various health concerns, including hormonal disruptions, reproductive issues, and even potential carcinogenic effects.

51.     No reasonable consumer would expect that a product marketed for use on genitalia contain dangerous PFAS, which are indisputably linked to harmful health effects in humans. Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Products

**IV.     Defendant's Misrepresentations And Omissions Are Actionable**

52.     Plaintiff and Class Members would not have purchased the Products on the same terms had they known the truth about the Product.

53.     As the result of Defendant's brand recognition and reputation, Defendant is able to charge, and does charge, a premium above the price for condoms charged by competitors and generic manufacturers.

54.     Defendant referred, and continues to refer, to its Products as "trusted for over 100 years," "America #1 Condom" and "made from premium quality latex."

55.     Nowhere on the Products packaging or labels does Defendant disclose the presence of PFAS. Reasonable consumers would believe the Products to be free of harmful toxins.

56.     Plaintiff and Class Members bargained for condoms that were free of harmful toxins, and were deprived of the basis of their bargain when Defendant sold them a Product containing PFAS.

57.     Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Product.

58.     Moreover, because these facts relate to a critical safety-related deficiency in the Product, Defendant was under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Products and to disclose that the Products may contain substances known to have adverse health effects.  Defendant, as manufacturer or a party to a contract to manufacture, thereby providing and approving designs of the Products, and as sellers and advertisers of the Products, is best situated to know the content of its Products. Nonetheless, Defendant concealed and affirmatively misrepresented the true nature of the Products, as discussed herein.

59.     Consumers lack the expertise to ascertain the true ingredients in the condoms prior to purchase.

60.     Absent testing by a qualified lab, consumers such as Plaintiff and the Class Members were unable to determine that Defendant's Products contained PFAS chemicals given Defendant's failure to disclose the presence of PFAS.

61.     Accordingly, reasonable consumers must, and do, rely on Defendant to accurately and honestly advertise its Products' ingredients and benefits. Further, consumers rely on Defendant to not contradict those representations by using artificial chemicals in their condoms that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers purchasing decisions.

62.     Consumer reliance upon Defendant's representations and omissions were reasonable and foreseeable. It is beyond reasonable dispute that the presence of harmful chemicals in condoms is material to reasonable consumers.

63.     Defendant had exclusive knowledge of the contents and ingredients of its Trojan condoms, including whether the products contained PFAS chemicals.

64.     Defendant also had exclusive knowledge of its ingredients suppliers and obtained or could have obtained information from their suppliers about the contents and ingredients of the condoms, including whether they contained PFAS chemicals.

65.     Likewise, Defendant is in the best position to know what content it places on the Products during the relevant timeframe.

66.     Defendant's false statements, misleading, and material omissions are intentional and careless, and render their condoms worthless or less valuable.

67.     Had Defendant disclosed to Plaintiff and Class Members that the Products contained and still contain PFAS chemicals, Plaintiff and Class Members would not have purchased Defendant's Products, or they would have paid significantly less for them.

68.     Plaintiff and Class Members were among the intended recipients of Defendant's deceptive representations and omissions described herein.

69.    Defendant's representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions, especially for a product such as condoms.

70.    In making the false, misleading, and deceptive representations, Defendant knew and intended consumers would pay a premium for their Trojan brand Products that are made from or contain synthetic or artificial chemical ingredients that are known to be harmful to humans and the environment.

71.    Plaintiff and Class Members paid money for Defendant's Products, and paid a premium for an expected quality above (or at least comparable to) that of Defendant's competitors. However, Plaintiff and Class Members did not obtain the full value of the Products due to Defendant's misrepresentations as described herein.

72.    Plaintiff and Class Members purchased, purchased more of, or paid more for, Defendant's Trojan brand condoms than they would have had they known the truth about the Products' harmful ingredients. Accordingly, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

## CLASS ALLEGATIONS

73.    ***Nationwide Class.***  Plaintiff brings this nationwide class action pursuant to rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as:

> All persons in the United States who purchased the Products during the statute of limitations period (the "Class").

74.    Plaintiff also seeks to represent a subclass of all persons who purchased the Products in New York during the Class Period (the "New York Subclass" or "Subclass").

75.    Excluded from the Classes are: (1) persons who made such purchases for purposes of resale; (2) any Judge or Magistrate presiding over this action and any members of their families; (3) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (4) Plaintiff's counsel and Defense counsel.

76.    As a result of additional information obtained through further investigation and discovery, the above-described Class and Subclass may be modified or narrowed as appropriate.

77.    ***Numerosity.***  At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclass ("Class Members" or "Subclass Members"). However, given the nature of the claims, Plaintiff believes that Class and Subclass Members are so numerous that joinder of all members is impracticable.

78.    ***Commonality and Predominance.***  There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and fact common to members of the Class that predominate over questions that may affect individual Class Members include:

- Whether the Products contain PFAS;

- Whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

- Whether Defendant had a duty to disclose the presence of PFAS in its Products;

- Whether the Products posed a health risk to consumers;

- Whether Defendant's conduct was unlawful;

- Whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class;

- Whether Plaintiff and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

79.    With respect to the New York Subclass, additional questions of law and fact common to the members include whether Defendant violated New York General Business Law § 349, and New York General Business Law § 350.

80.    ***Typicality.***  The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like other members of the Classes, purchased the Products, relying on the representations, warranties, and omissions made by Defendant on its packaging that the Products were safe and did not contain harmful chemicals.

81.    ***Adequate Representation.***  Plaintiff is an adequate representative of the Class and New York Subclass because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

82.    ***Superiority.***  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of

Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## CAUSES OF ACTION

### COUNT I
**Violation of New York General Business Law § 349**
**(On Behalf Of The New York Subclass)**

83.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

84.    Plaintiff brings this claim individually and on behalf of the New York Subclass against Defendant.

85.    Defendant markets the Products as being safe for use on genitalia when testing has shown the likely presence of PFAS, which have a negative impact on human health.

86.    Defendant has violated, and continues to violate, § 349 of the New York General Business Law ("GBL"), which makes deceptive acts and practices unlawful. As a direct and proximate result of Defendant's violation of § 349, Plaintiff and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

87.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by failing to disclose that the Products contained PFAS.

88.    The foregoing deceptive acts and practices are misleading in a material way because, as alleged throughout, PFAS are harmful to humans and raise material safety concerns. Accordingly, Defendant's omission was material to Plaintiff and members of the New York Subclass.

89.    Defendant's improper consumer-oriented conduct is misleading in a material way in that it, inter alia, induced Plaintiff and the New York Subclass members to purchase and to

pay the requested price for the Products when they otherwise would not have, or would not have been willing to pay as much.

90.    Defendant made the untrue and/or misleading representations and omissions willfully, wantonly, and with reckless disregard for the truth. Defendant manufactures and sells the Products and therefore possessed the knowledge of what the Products contained.

91.    Plaintiff and the New York Subclass members have been injured by their purchase of the Products, which were worth less than what they bargained and/or paid for, and which they selected over other products that may have been truthfully marketed.

92.    Defendant's labelling induced Plaintiff and the New York Subclass members to buy the Products, to buy more of them, and/or to pay the price requested.

93.    As a direct and proximate result of Defendant's violation of § 349, Plaintiff and other members of the New York Subclass paid for falsely advertised Products and, as such, have suffered damages in an amount to be determined at trial.

94.    By reason of the foregoing, Plaintiff and the New York Subclass members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to GBL § 349(h).

<u>**COUNT II**</u>
**Violation of the New York General Business Law § 350**
**(On Behalf Of The New York Subclass)**

95.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

96.    Plaintiff brings this claim individually and on behalf of the New York Subclass against Defendant.

97.    The acts of Defendant, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

98.    GBL § 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

99.    GBL § 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

100.    Plaintiff and the members of the New York Subclass are consumers who purchased Defendant's Products in New York.

101.    As a seller of goods to the consuming public, Defendant is engaged in the conduct of business, trade, or commerce within the intended ambit of § 350.

102.    Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way, which constitutes false advertising in violation of § 350 by failing to disclose that the Products contain PFAS.

103.    As manufacturers and sellers of the Products, Defendant possessed the knowledge that the Products contain PFAS.

104.    Defendant's representations (made by statement, word, design, device, sound, or any combination thereof), and also the extent to which Defendant's advertising has failed to reveal material facts with respect to its Products, as described above, have constituted false advertising in violation of § 350.

105.    Defendant's actions led to direct, foreseeable, and proximate injury to Plaintiff and the members of the New York Subclass.

106.    As a consequence of Defendant's deceptive marketing scheme, Plaintiff and the other members of the New York Subclass suffered an ascertainable loss, insofar as they would not have purchased the Products had the truth been known, would not have paid the requested price for the Products and/or would have purchased fewer of the Products; moreover, as a result

of Defendant's conduct, Plaintiff and the other members of the New York Subclass received
Products of less value than what they paid for.

107.    By reason of the foregoing, Plaintiff and the New York Subclass members are
entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3)
reasonable attorneys' fees, pursuant to GBL § 350-e(3).

**COUNT III**
**Breach of Implied Warranty**
**(On Behalf Of The Nationwide Class)**

108.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

109.    At all relevant times, Defendant was the merchant of the Products that were sold
to Plaintiff and Class members and was in the business of marketing, promoting, and selling such
products to the consuming public. Defendant designed, developed, and sold the condoms
knowing that Plaintiff and Class members would use them on their body for sexual intercourse.

110.    Each condom Product sold by Defendant comes with an implied warranty that it
will be merchantable and fit for the ordinary purpose for which it would be used. Defendant
expected the consuming public, including Plaintiff and Class Members, to use the Products on
their skin and such use was reasonably foreseeable. Plaintiff and Class Members also expected
the condoms to be useable and to perform in a manner consistent with their packaging and
labeling.

111.    Defendant breached its implied warranty of merchantability because their
Products were not in merchantable condition when sold because they contain or have a material
risk of containing dangerous PFAS. The Products are not fit for merchantability because the
safety risks of coming in contact with PFAS outweigh the utility of Defendant's Products, given
there are comparable condoms on the market that do not contain PFAS.

112. Defendant's Products are not fit for the ordinary purpose for which they were sold because they contain or have a material risk of containing dangerous PFAS.

113. Defendant did not properly disclaim the warranty of merchantability and fitness for a particular purpose.

114. As a result of Defendant's breaches of implied warranties of merchantability, as alleged herein, Plaintiff and the Class Members seek an order awarding compensatory damages and any other just and proper relief available under the law.

**COUNT IV**
**Fraudulent Concealment**
**(On Behalf Of The Nationwide Class)**

115. Plaintiff incorporate the foregoing allegations as if fully set forth herein.

116. Plaintiff brings this claim individually and on behalf of the Nationwide Class.

117. Defendant concealed and failed to disclose on the Products packaging and labeling the material fact that the condoms contained or risked containing PFAS, and that the condoms were not safe for use.

118. As discussed at great length above, it has been widely publicized that PFAS are harmful chemicals to humans, animals, and the environment. The EPA, CDC and many other groups and publications have reported on the potential risks and dangers of PFAS chemicals. Accordingly, Defendant knew or should have known that PFAS are dangerous, and concealing this known fact is detrimental to the consumer.

119. Defendant has a duty to disclose that the condoms contained or risked containing PFAS; however, Defendant did not make this disclosure.

120. Plaintiff and the Class Members all paid a premium for the Products based upon the way the Products are represented, which did not include the inclusion of PFAS. Products that are tainted with PFAS are not worth a premium to a reasonable consumer.

121.     Defendant had superior knowledge or means of knowledge available to them and knew that Plaintiff and Class Members would rely upon the representations and omissions of Defendant regarding the quality and ingredients of its condoms. Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains PFAS, especially at the point of sale.

122.     Defendant's concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiff and the Class Members are influenced by the ingredients and contents listed, as well as any warnings (or lack thereof) on the products they buy. Defendant knows that if they had not omitted that the Products contained or risked containing PFAS, then Plaintiff and the Class Members would not have agreed to pay a premium price for the Products, or would not have purchased the Products at all; however, Defendant wanted to increase sales and profits.

123.     Defendant's concealment misled Plaintiff and the Class Members as to the true nature of what they were buying and putting onto and into their bodies and their sexual partners' bodies.

124.     Defendant fraudulently concealed that the Products contained or risked containing PFAS. Consequently, Plaintiff and the other members of the Class have suffered injury and are entitled to damages in an amount to be proven at trial.

125.     Defendant had a duty to Plaintiff and the Nationwide Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Product.

## COUNT V
### Unjust Enrichment
### (On Behalf Of The Nationwide Class)

126.    Plaintiff incorporate the foregoing allegations as if fully set forth herein.

127.    Plaintiff brings this claim individually and on behalf of the Nationwide Class.

128.    To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

129.    Plaintiff and the Nationwide Class Members conferred benefits on Defendant by purchasing the Products.

130.    Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and the Nationwide Class Members' purchases of the Products.  Retention of those monies under these circumstances is unjust and inequitable because Defendant misrepresented and failed to disclose that the Products were unfit for their intended purpose as it was not safe for use.  These omissions and misrepresentations caused injuries to Plaintiff and the Nationwide Class Members because they would not have purchased the Products if the true facts were known.

131.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and the Nationwide Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

132.    Here, equitable relief in the form of non-restitutionary disgorgement of profits is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from her purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Products, Plaintiff and the Nationwide Class Members would be left without the parity in purchasing power to which they are entitled.

133.     Non-restitutionary disgorgement of profits may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiff and the Class Members are in the same place they would have been in had Defendant's wrongful conduct not occurred, *i.e.*, the position to make an informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at their disposal.

134.     As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and the Class Members suffered injury and seek the disgorgement and restitution of Defendant's wrongful profits, revenue, and benefits, plus interest, to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendant as follows:

(a)     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representatives of the Classes, and naming Plaintiff's attorneys as Class Counsel;

(b)     For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class and Subclass on all counts asserted herein;

(d)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and;

(h)     For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: September 9, 2024                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Joshua D. Arisohn*
        Joshua D. Arisohn

Joshua D. Arisohn
Matthew A. Girardi
Caroline C. Donovan
1330 Avenue of the Americas, Fl 32
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jarisohn@bursor.com
        mgirardi@bursor.com
        cdonovan@bursor.com

*Attorneys for Plaintiff*